IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NORTHWEST SAVINGS BANK : | |
| AND FINANCIAL SERVICES, : | No. 4:09-CV-1416 |
|     Plaintiff : | |
| : | (Chief Judge Kane) |
| v. : | |
| : | |
| NS FIRST STREET LLC and 2200 SOUTH : | |
| ATHERTON STREET LLC, : | |
|     Defendants : | |

**MEMORANDUM**

This case concerns a dispute over a lease agreement between Plaintiff Northwest Savings Bank and Defendants NS First Street LLC and 2200 South Atherton Street LLC for property located at 2200 South Atherton Street, State College, Pennsylvania. Pending before the Court is a motion for partial summary judgment filed by Plaintiff. (Doc. No. 43.) In its motion, Plaintiff seeks judgment on its second cause of action, namely a declaratory judgment from the Court finding that Plaintiff did not default under the terms of the parties' lease agreement. For the following reasons, the Court will grant the relief sought by Plaintiff's motion.

**I.    BACKGROUND**

    **A.    Factual History**

Taken in a light most favorable to the non-moving party, the salient facts are as follows. Plaintiff Northwest Savings Bank, an entity organized under the Commonwealth of Pennsylvania, has a place of business located at 100 Liberty Street, Warren, Pennsylvania. (Doc. No. 1, Ex. A ¶ 1.) Defendants NS First Street LLC and 2200 South Atherton Street LLC are limited liability companies organized under the laws of New Jersey. (Doc. No. 1 ¶ 6.) Defendant NS has a registered office located at 2200 South Atherton Street, State College,

1

Pennsylvania. (Doc. No. 1, Ex. A ¶ 2.) Defendants are owned by principals David Ross and Richard Becker. (Doc. No. 15 ¶¶ 12-13.)

On July 14, 2005, Plaintiff entered into a lease agreement ("Lease") with DWEK Branches, LLC ("DWEK") for the 2200 South Atherton Street property (the "Property"). (See Doc. No. 45, Ex. 1.) Pursuant to the terms of the Lease and Lease Rider, Plaintiff leased the Property from DWEK for a term of ten years with an option to extend such term for three additional five year periods.

The Lease provides that the Property is "to be used and occupied only and for no other purpose than retail branch bank and general office use." (Doc. No. 45, Ex. 1 at 1.) However, pursuant to the Lease Rider, Plaintiff agreed not to use the Property as a bank until after March 15, 2009.[1] The Lease mandates that Plaintiff "take good care of the Premises and will, at the Tenant's own cost and expense, make all repairs." (Id.) However, the Lease also states that "[n]o alterations, additions or improvements may be made . . . without the written consent of the Landlord." (Id.) The Lease defines "Events of Default," which allow Defendants to seek a remedy as, inter alia:

> (a) a default by the Tenant in the payment of rent, or any additional rent when due or within 10 days thereafter; (b) a default by the Tenant in the performance of any of the other covenants or conditions of this Lease, which the Tenant does not cure within 20 days after the Landlord gives the Tenant written notice of such default; . . . (i) if the Premises are or become abandoned, deserted, vacated or vacant for more than thirty (30) consecutive days . . . .

(Doc. No. 45, Ex. 1 at 4-5.) In the event of a default, the Lease allows the Landlord to reenter

---

[1] According to William Harvey, Plaintiff's Executive Vice President and Chief Financial Officer, Plaintiff agreed not to begin use of the Property until the expiration of the restriction in March 2009 because Plaintiff valued the location of the Property. (Doc No. 1, Ex. C ¶ 7.)

and possess the Property.  (Id. at 5.)  Additionally, if a default occurs, "the Landlord may, at any time thereafter, terminate this Lease and the term hereof, upon giving to the Tenant five (5) days' notice in writing of the Landlord's intention so to do."  (Id.)

In 2007, DWEK filed for bankruptcy.  On November 28, 2007, the United States Bankruptcy Court for the District of New Jersey approved the sale of the property at issue to Defendants as tenants in common and subject to the lease with Plaintiff.  (Doc. No. 45, Ex. 3.)  After Defendants acquired the Property in the bankruptcy proceeding, Plaintiff continued to make rental and other payments required by the Lease.  Defendants were aware of the use restriction on the Property and the fact that Plaintiff was not occupying the Property.  (Doc. No. 49 ¶ 35.)

Plaintiff was interested in the possibility of expanding the building, and had discussed this possibility with Defendants.  On June 27, 2008, representatives of Plaintiff met with Defendants.  Although the parties dispute whether it was a priority of the meeting, the parties agree that a review of different plans for the building made up "a very small part of the meeting." (Doc. No. 49 ¶ 13.)  The parties discussed several options of renovating the Property.  (Id. ¶ 16.) Plaintiff contends that it reviewed with Defendants plans for an extensive building renovation estimated to cost anywhere from 1.0 to 1.5 million dollars.[2]  (Doc. No. 46 ¶ 15.)  Defendants state that the renovations referenced by Plaintiff were only one option discussed at the meeting. (Doc. No. 49 ¶ 16.)

---

[2] Plaintiff alleges that "[t]hese plans included the installation of an elevator, an addition to the building, stairwell modifications, restoration of the exterior and interior, renovations to the building to bring it into compliance with the Americans with Disabilities Act ('ADA') and local building code, and repair of the HVAC system."  (Doc. No. 46 ¶ 15.)

The condition of the building is a source of disagreement among the parties. Plaintiff claims that, when DWEK left the Property, all utilities except electricity were turned off; water damage to walls and ceilings was evident; other portions of the building, including the teller line, were damaged; and animals had caused further damage. (Doc. No. 46 ¶ 14.) On the other hand, Defendants state that these observations by an employee of Plaintiff occurred "at an unspecified time." (Doc. No. 49 ¶ 14.) Defendants state that a substantial amount of the building's deterioration has occurred since the initiation of the Lease on July 14, 2005. (Id.) As noted above, Plaintiff admits that it has not occupied the Property.

Plaintiff states that Defendants proposed to pay for renovation work to the Property by restructuring Plaintiff's Lease payments. (Rec. Doc. No. 46 ¶ 16.) Plaintiff states that it refused Defendants' proposal in light of the concomitant rent increase Plaintiff would be required to bear. (Id. ¶ 17) On the other hand, Defendants state that, in light of the numerous renovation plans discussed by the parties, any reference by the Plaintiff to "renovations" is overly vague. (Doc. No. 49 ¶ 16.). Defendants also deny the existence of any proposal of a rent increase. (Id. ¶ 17.) However, in his deposition, Ross acknowledged an email in which he wrote to Becker, the following:

> We just jack the rent to whatever we want it. It just looks bad. We need to push in a nice way. Maybe we go to 225 a year, and if they say yes, we scale back the site work. If they say 225 is too high, we drop the funding to 600 and come in at 175.

(Doc. No. 50, Ex. F at 102.) In a September 29, 2008 exchange, Ross and Becker emailed the following:

> We may have a problem because the lease in the rider requires the tenants maintain the HVAC. I thought we might have something with signage, but again the rider over road [sic] this and allows for

>  signage without landlord's permission. I think you are already using this stick, and it is our best threat.
>
>  . . . Our best option is to make them say, okay, we simply will not open. In the medium term two to five years, they will reconsider and perhaps be willing to make the improvements at that point. If they open now with the paint over branch, the odds that they ever spent on the improvements drop dramatically.
>
>  . . . Need some more ammo. Told Lowery that we do not want that.

(Doc. No. 45, Ex. 4 at 128-129.) In another email sent on October 28, 2008, Ross wrote, "We have nothing to lose, either we push hard and they soften up or they get pissed and just keep us in the same lease." (Id. at 140.)

On or about March 23, 2009, Plaintiff hired CE Woods Contracting and Hoffman Architecture. (Doc. No. 46 ¶ 24.) Although Plaintiff did not obtain written authorization from Defendants for any construction that it intended to perform, Plaintiff began to undertake work on the Property, including repairing the building, making it compliant with the Americans with Disabilities Act and local building code, repairing the HVAC system, and renovating the interior. (Doc. No. 46 ¶ 20; Doc. No. 49 ¶ 20.) Plaintiff obtained municipal approvals and permits for the project; however, its architect identified Plaintiff as the Property owner on the building permit application. (Doc. No. 46 ¶ 27.) The parties dispute whether Plaintiff correctly represented the scope of the job to the Zoning Department. (See Doc. No. 49 ¶ 27.)

At around the same time that renovations were underway, the parties were engaged in discussions to allow Plaintiff to purchase the Property. (Doc. No. 46 ¶ 23; Doc. No. 49 ¶ 23.) Although the parties disagree as to why negotiations broke down, the parties came to an impasse over the price of the Property in late May 2009. (Doc. No. 46 ¶ 29; Doc. No. 49 ¶ 29.) In a telephone conversation between Plaintiff's representative and Ross, Ross demanded that the

renovation work be stopped and that a meeting be arranged between Ross, Becker, and Plaintiff's representatives. (Doc. No. 46 ¶ 31.) However, a meeting was never scheduled. (Doc. No. 49 ¶ 31.)

On or about May 22, 2009, without prior written notice to Plaintiff, Defendants contacted the Centre Region Code Administration ("CRCA") and demanded that the CRCA withdraw the previously issued permit based on the misidentification of the Property owner by the architects on the building permit application. (Doc. No. 46 ¶ 32.) As a result, the CRCA issued a stop-work order to Plaintiff. (Doc. No. 45, Ex. 10.) On the same evening that Defendants contacted the CRCA, Ross emailed Becker the following:

> NWS business thinking
> 1. the lease is cheap @ 60k/y
> 2. want the location badly in fact NWS paid a 60k x 4 = 240k premium to lock it up
> 3. they want to buy it but the rent is locked in so cheap it is financially more beneficial to pay 60k vs. <u>buying @</u> 1.1
>
> Our business thinking
> 1. if we are the biggest pain in the butt LL NWS will pay a premium to get rid of us. ie buy us out at 1.1M.

(Doc. No. 45, Ex. 11.) (emphasis included) Ross emailed Becker again at approximately 8:54 p.m. that same evening:

> Richard
> key is 4 yrs+ of vacancy
> lease default starts at 30 day
> however notice is required...which we need to do asap
> also we can give them a hard time over signage
> rider#9 says" 1 sign on front facade of building ....means no pylon sign or any other signs
> just break'n NWS stones
> Dave

(<u>Id.</u>) Defendants sent a notice letter, dated June 2, 2009, to Northwest alleging four events of

default and demanding that the bank vacate the premises in five days. (Doc. No. 46 ¶ 37; Doc. No. 45, Ex. 12.) The letter accused Plaintiff of "committ[ing] numerous acts and omissions in default of the lease for the Premises." (Doc. No. 45, Ex. 12.) According to the letter, Plaintiff had taken action which violated: (1) the Lease paragraph entitled "Compliance with Laws etc."; (2) the Lease sub-paragraph defining an event of default as leaving the Premises vacant for more than thirty consecutive days; (3) the Lease paragraph entitled "Alterations and Improvements"; and (4) Lease Rider paragraph 24 governing tenant improvements. (Id.) Although Plaintiff frames the letter as a notice of default, Defendants aver that it was a termination letter.[3] (Id.; Doc. No. 49 ¶ 37.)

On June 10, 2009, Plaintiff sent a copy of renovation drawings and plans to Defendants for their review and approval, and Defendants received the plans that same day (Doc. No. 46 ¶ 39; Doc. No. 49 ¶ 39.) Plaintiff also requested Defendants' approval. (Doc. No. 1, Ex. C ¶ 20.) Ross has admitted that he never contacted Plaintiff to ask if the plans thus transmitted were the complete plans or to inquire in any way as to the transmitted plans. (Doc. No. 45, Ex. 4 at 53-55.) Becker admitted in a deposition that he too received a copy of the above-referenced plans. (Id. at 52-53.) According to the stop-work order served upon Plaintiff by the CRCA, Plaintiff was required to resubmit the permit application with the property owner's signature. (Doc. No. 15 ¶ 42; Doc. No. 19 ¶ 42.)

---

[3] Interestingly, the termination letter states that, pursuant to the "Termination on Default" paragraph as contained in the lease, the landlord will provide the tenant with "five (5) days' notice in writing of the Landlord's intention to terminate the lease." (Doc. No. 45, Ex. 12.) The letter goes on to state that "[t]he lease *shall now terminate* five days after the Bank has received this letter as indicated by the certified mail receipt." (Id. (emphasis added).) The effect of this letter on the termination of the Lease will be discussed in greater detail below. See infra, Part III.A.

### B.     Procedural History

On June 19, 2009, Plaintiff commenced this action against Defendants in the Court of Common Pleas of Centre County, Pennsylvania.  On July 21, 2009, Defendants removed the action to the United States District Court for the Middle of Pennsylvania pursuant to 28 U.S.C. § 1441.  In its amended complaint filed on October 8, 2009, Plaintiff includes three causes of action. (Doc. No. 15.)  First, Plaintiff asserts a breach of covenant of quiet enjoyment claim against Defendants.  Second, Plaintiff seeks a declaratory judgment that Plaintiff has not breached the Lease with Defendants or that any alleged breach has been properly cured under the terms of the lease.  Third, and in the alternative, Plaintiff seeks a judgment against Defendants for damages caused to Plaintiff by Defendants' alleged breach of the Lease and illegal actions in preventing Plaintiff from occupying the leased property.  On October 27, 2009, Defendants filed an amended answer and counterclaims alleging multiple breaches of the Lease and Lease Rider by Plaintiff and the right to terminate the Lease.  (Doc. No. 19.)

On October 4, 2010, Plaintiff filed the currently pending motion for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56.  (Doc. No. 43.)  With this motion, Plaintiff first asks that this Court declare that Plaintiff did not breach the terms of the Lease with Defendants when it engaged "in routine repair and maintenance work."  (Id. at 1.)  In the alternative, Plaintiff asks that this Court declare that Plaintiff properly cured any potential breach.  (Id.)  Second, Plaintiff asks that this Court conclude as a matter of law that Plaintiff did not breach the terms of the Lease when it allegedly failed to occupy the Property.  (Id.)  In the alternative, Plaintiff asks that this Court find that Defendants are barred "from asserting any such alleged breach as grounds for termination of the Lease [because the] Defendants['] repeated

failure to assert such ground as a basis for termination constitutes waiver." (Id. at 1-2.)

The parties have exhaustively briefed the pending motion (See Doc. Nos. 44, 50, 52, 58, 74), and the Court, on April 26, 2011, held oral argument on the motion. The motion, therefore, is now ripe for disposition.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is

appropriate. Celotex, 477 U.S. at 322-23.

## III.  DISCUSSION

In its motion now pending before Court, Plaintiff seeks judgment on its second cause of action—the declaratory judgment portion of its complaint—which asks the Court to find that Plaintiff did not default under the terms of the Lease. Plaintiff's motion specifically addresses the four Lease provisions cited by Defendants in the June 2, 2009 termination letter. Plaintiff asserts that "[w]hile there may be disputed facts between the parties with regard to other issues, the material facts relating to [these] alleged breaches are not in dispute." (Doc. No. 44 at 3.)

### A.  Compliance with Law and Written Consent Provisions

The Court will first address whether Plaintiff properly cured the following breaches as alleged by Defendants: (1) Plaintiff's failure to obtain Defendants' written consent to improvements to the property; and (2) Plaintiff's failure to comply with applicable laws. The parties agree that Plaintiff failed to seek written consent prior to beginning renovations on the Property. As to the applicable law provision, Defendants allege that Plaintiff violated 18 Pa. Con. Stat. § 4903(a)(2) when its architect represented the bank as being the owner of the property in a building permit application.[4]

---

[4] Defendants contend that there are two additional examples of violations of law by which Plaintiff breached the lease: (1) a statement by Plaintiff to the Zoning Department that improvements only pertained to "painting and carpeting"; and (2) Plaintiff's statement that only "painting and carpeting" was involved as part of the improvements in an affidavit and the complaint filed with the Court of Common Pleas of Centre County. (Doc. No. 50 at 16-18.) This Court agrees with Plaintiff that neither of the above can constitute violations of law supporting a breach of the Lease. First, there is nothing in the record that supports a conclusion that the building permit was revoked because of a misrepresentation concerning "painting and carpeting" to the Zoning Department. (See id., Ex. M.) Second, the alleged misrepresentations to the state court occurred after Defendants' notice letter and logically could not have constituted a basis for Defendants' termination of the Lease at that time. (Doc. No. 52 at 12.)

"As a basic premise, federal courts sitting in diversity cases are required to apply the substantive law of the state whose laws govern the action." Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir. 1990) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)).  In Pennsylvania, "lease forfeitures are deemed odious and looked upon with disfavor"; as such, "[l]eases must be 'strictly construed' and interpreted to avoid forfeiture whenever possible." Oxford Assocs. Real Estate, L.P. v. TSI Soc'y Hill, Inc., No. 05-cv-04445, 2007 U.S. Dist. LEXIS 2605, at *10, 2007 WL 128886, at *3 (E.D. Pa. Jan. 11, 2007).  A notice of default sent by a landlord to a tenant must "state clearly, positively[,] and unequivocally the intention of the landlord to repossess the premises, or of the tenant to vacate or surrender the premises at a fixed time. . . . It must [also] be positive, decisive, and without ambiguity." Fotterall v. Armour, 66 A. 1001, 1003 (Pa. 1907).  If "doubt arises out of the uncertainty as to the meaning of the language used in a lease, its provisions will be construed most strongly against the lessor and in favor of the lessee." Kline v. Marianne Germantown Corp., 263 A.2d 362, 364 (Pa. 1970).

The terms of the Lease clearly provide that, after the landlord provides the tenant with written notice of a default in the performance of any condition or covenant in the Lease other than a default in the payment of rent, the tenant is entitled to cure such default within twenty days. (Doc. No. 45, Ex. 1 at 4.)  Quite simply, Defendants in this case did not provide Plaintiff such notice and an opportunity to cure.  Defendants contacted the CRCA to have a building permit revoked, an action which they were certainly entitled to do as Plaintiff was listed, incorrectly, as the property owner on the building application.  In addition, Defendants sent Plaintiff a termination letter on June 2, 2009, in which Defendants indicated that the Lease would be terminated within five days of Plaintiff's receipt of the letter.  This letter listed four

provisions of the Lease that Defendants claimed were violated, though no specific examples were provided.

The language utilized by Defendants in the termination letter evinces a belief on their part that an event of default had occurred. However, an event of default based upon a breach of a covenant or a condition of the Lease, other than one based upon a default in the payment of rent, could have occurred *only after* a tenant was provided written notice of such a default and *only after* such tenant failed to cure the default within twenty days. In regard to Plaintiff's alleged failure to comply with laws and its failure to obtain the written consent of Defendants to alterations and improvements, such notice and an opportunity to cure were not provided. Defendants cannot, therefore, rely on these alleged breaches as a basis for termination of the Lease.[5] Defendants failed to provide adequate notice of default and an opportunity to cure regarding the curable violations alleged in the June 2, 2009 termination letter. Therefore, Plaintiff's motion for partial summary judgment as to its alleged failure to comply with laws and failure to obtain Defendants' written consent to improvements of the Property must be granted.

### B. Continuous Occupancy Provision

The next issue that this Court must address is whether Plaintiff is entitled to partial summary judgment in its favor declaring that it did not breach the occupancy provision of the Lease. According to the Lease, "[t]he Premises are to be used and occupied only and for no

---

[5] In addition, it is noteworthy that, after receiving Defendants' June 2, 2009 letter, Plaintiff sent Defendants building plans on or about June 10, 2009, in order to seek written consent. Plaintiff needed such written consent in order to cure the improper listing in a building permit of the bank as owner of the Property, which Plaintiff claims was made by its architect. However, Defendants never reviewed the plans and, without such consent, the Plaintiff could not begin its renovation work on the Property.

other purpose than *retail branch bank and general office use*." (Doc. No. 45, Ex. 1 at 1 (emphasis added).) An event of default may occur under the Lease "if the Premises are or become abandoned, deserted, vacated or vacant for more than thirty (30) consecutive days." (Id. at 4.) Pursuant to the Lease Rider:

> Tenant acknowledges that there is a restriction against the use of the premises as a bank contained in the deed pursuant to which landlord acquired title to the property. Tenant further acknowledges that said restriction does not expire until March 15, 2009. For so long as the restriction remains in effect tenant agrees not to violate said restriction. Tenant shall indemnify, save harmless and defend landlord from and against any and all claims, demands, costs, fees, charges, expenses of any nature whatsoever arising out of any action based upon tenant's violation of the restriction *against use of the premises as a bank.*

(Doc. No. 45, Ex. 2 at 6 (emphasis added).)

In Pennsylvania, "a lease is in the nature of a contract and is controlled by principles of contract law . . . ." Amoco Oil Co. v. Snyder, 478 A.2d 795, 798 (Pa. 1984) (citing Ezy Parks v. Larson, 454 A.2d 928, 934 (Pa. 1982)). To support a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damage. Church v. Tentarelli, 953 A.2d 804, 808 (Pa. Super. Ct. 2008) (citation omitted). As the Pennsylvania Supreme Court has noted:

> [W]here language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended.
>
> . . .
>
> [T]his Court long ago emphasized that [t]he parties [have] the right to make their own contract, and it is not the function of this Court to re-write it, or to give it a construction in conflict with . . . the accepted and plain meaning of the language used. It is not the province of the court to alter a contract by construction or to make a

>    new contract for the parties; its duty is confined to the interpretation
>    of the one which they have made for themselves, without regard to its
>    wisdom or folly.

Steuart v. McChesney, 444 A.2d 659, 661-62 (Pa. 1982) (internal citations and quotation marks omitted) (emphasis included).

Plaintiff contends that it did not breach the above Lease provision "because the Lease and Lease Rider specifically prevent Northwest from either (i) occupying the Property as a bank branch or (ii) using the Property for any other purpose." (Doc. No. 44 at 21.) Defendants, on the other hand, argue that "[t]he [L]ease language . . . does not prohibit 'any other purpose' as the Bank contends, but instead merely prohibits the use of the Property *as a bank*." (Doc. No. 50 at 19 (emphasis added).)

The Court agrees with Plaintiff's interpretation of the occupancy provision. The Lease language is clear in its statement that the Property may be used only for the purpose of "retail branch bank and general office use." (Doc. No. 50, Ex. A.) Similarly, Plaintiff was prohibited from using the Property as a bank until the restriction was lifted on March 15, 2009. The clear language of the Lease provides for one purpose: "retail branch bank *and* general office use." The fact is that the purpose at issue between the parties is written in the conjunctive. Defendants appear intent on reading this phrase in the disjunctive: a "retail branch bank *or* general office use." To do so, one would have to replace the word "and" with the word "or," the word "purpose" with the word "purposes," and delete the word "use." As such, Defendants would prefer the use restriction read, in part, in the following way: "The Premises are to be used and occupied only and for no other purposes other than as a retail branch bank or general office."

This language is not the language agreed to by the parties in the use restriction provision

of the Lease. The original parties to the Lease agreed on one purpose: "retail branch bank and general office use." As such, Plaintiff was required to meet both parts of the conjunctive phrase in order to meet the use requirement.[6] The bank could not operate as a retail bank branch until the restriction was lifted on March 15, 2009. Therefore, the bank cannot be faulted for failing to occupy the premises before, at the earliest, March 15, 2009. The Court will therefore grant Plaintiff's partial motion for summary judgment as to the occupancy provision based on its conclusion that Plaintiff's failure to occupy the premises prior to March 15, 2009, does not constitute a breach of the Lease's occupancy provision.[7]

## IV. CONCLUSION

Pursuant to the foregoing analysis, the Court finds that: (1) Defendants failed to provide adequate notice of default and an opportunity to cure regarding their allegations that Plaintiff failed to comply with applicable laws and failed to obtain Defendants' written consent to improvements of the Property; and (2) Plaintiff did not breach the Lease's occupancy provision.

---

[6] One can imagine that a bank branch operating as such would likewise meet the "general office use" requirement. However, general office use unrelated to operation as a bank would not suffice.

[7] The Court notes that even if the Court adopted Defendants' reading of the occupancy provision, it would still likely conclude that Defendants waived any right to enforce that provision without notice and a chance to cure by Plaintiff. Defendants were aware that Plaintiff was not occupying the property, yet Defendants continued to accept at least nineteen rental payments. Although Defendants rely on the non-waiver provision in the Lease (Doc. No. 50, Ex. A at 5), there is a dearth of opinions from Pennsylvania courts interpreting such "non-waiver" or "no-waiver" provisions. In the absence of any guiding precedent on point, and given Pennsylvania courts' disfavor of lease forfeiture provisions, see Oxford Assocs. Real Estate, L.P., 2007 U.S. Dist. LEXIS 2605, at *10, 2007 WL 128886, at *3, it is unlikely that the Pennsylvania Supreme Court would allow a landlord to accept rental payments for over a year and then suddenly, without notice and an opportunity to cure, evict a tenant who is operating under the tenant's own good faith reading of the lease.

Therefore, the Court must grant Plaintiff's motion for partial summary judgment. (Doc. No. 43.)

An order consistent with this memorandum follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NORTHWEST SAVINGS BANK** : | |
| **AND FINANCIAL SERVICES,** : | No. 4:09-CV-1416 |
|     **Plaintiff** : | |
| : | **(Chief Judge Kane)** |
| **v.** : | |
| : | |
| **NS FIRST STREET LLC and 2200 SOUTH** : | |
| **ATHERTON STREET LLC,** : | |
|     **Defendants** : | |

## ORDER

    **AND NOW**, on this 15th day of July 2011, in accordance with the accompanying memorandum, it is **HEREBY ORDERED THAT** Plaintiff's motion for partial summary judgment (Doc. No. 43) is **GRANTED**.

                                        s/ Yvette Kane
                                        Yvette Kane, Chief Judge
                                        U.S. District Court
                                        Middle District of Pennsylvania